UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LOUIS GEORGE LAROSE, IV, #663552,

       Petitioner,

v.                            CASE NO. 2:09-CV-14911
                                HONORABLE PAUL D. BORMAN

THOMAS BELL,

       Respondent.

_____/

## OPINION AND ORDER DENYING THE PETITION FOR A WRIT OF HABEAS CORPUS, DENYING A CERTIFICATE OF APPEALABILITY, AND DENYING LEAVE TO PROCEED IN FORMA PAUPERIS ON APPEAL

**I.**    **Introduction**

This is a habeas case brought pursuant to 28 U.S.C. § 2254. Michigan prisoner Louis George LaRose, IV ("Petitioner") was convicted of four counts of first-degree criminal sexual conduct (person under 13), MICH. COMP. LAWS § 750.520b(1)(a), four counts of second-degree criminal sexual conduct (person under 13), MICH. COMP. LAWS § 750.520c(1)(a), three counts of accosting a child for immoral purposes, MICH. COMP. LAWS § 750.145a, and four counts of aggravated indecent exposure, MICH. COMP. LAWS § 750.335a(2)(b), following a jury trial in the Oakland County Circuit Court. He was sentenced to concurrent terms of 35 to 55 years imprisonment on the first-degree criminal sexual conduct convictions, 10 to 15 years imprisonment on the second-degree criminal sexual conduct convictions, 2½ to 4 years imprisonment on the accosting a child convictions, and 104 days in jail (with credit for 104 days time served) on the indecent exposure convictions in 2007.

In his pleadings, Petitioner raises claims concerning the admission of other acts evidence, the use of jury questions, the prosecution's failure to turn over discovery, the proportionality of his sentence, and the trial court's sentencing decision. For the reasons set forth, the Court denies the petition for a writ of habeas corpus. The Court also denies a certificate of appealability and denies leave to proceed *in forma pauperis* on appeal.

## II.  <u>Facts and Procedural History</u>

Petitioner's convictions arise from his sexual misconduct with a neighbor girl in Waterford, Michigan from 1995 to 1997 when she was 6 to 8 years old and from 2002 to 2007 when she was 13 to 17 years old. The Court adopts the facts set forth by the prosecutor on direct appeal. Those facts are as follows:

> [C.B.] was 17 years old at the time of trial. (T II, 60.) She was born on December 25, 1989. (T II, 60.) At the time of trial, she was in 12th grade (a senior) at Waterford Mott High School. (T II, 61-62.)
>
> [C.B.] had lived at 2633 Mott Avenue in Waterford Township all of her life. (T II, 62.) Michelle Hobbs was like a godmother to her. (T II, 64.) Hobbs' 14 year-old daughter Cassie was [C.B's] best friend and [C.B.] considered her like a sister. (T II, 64.) [C.B.] would confide important and private things in·Michelle and Cassie that she would not tell her father. (T II, 65.)
>
> When she was younger, [C.B.] would play with [Petitioner's] son Evan because there were no little girls that lived nearby. (T II, 70.) Evan would come to her house and [C.B.] would go to [Petitioner's] house. (T II, 70.)
>
> When [C.B.] was six years old, something unusual began to happen when she would go to [Petitioner's] house to play with Evan. (T II, 83.) She would ask [Petitioner] to see Evan and [Petitioner] would say, "Hey, come here. Look at this" and take her into the garage. (T II, 85, 137.) Once in the garage, [Petitioner] (who would sit on a chair while [C.B.] would remain standing with her back to [Petitioner]) would pull down [C.B's] pants and underwear and touch her vagina with his fingers going inside her body. (T II, 85-89.) During this time, [Petitioner] would breathe "heavily." (T II, 88.) [Petitioner] would tell [C.B.] not to say anything to anyone or he would go to jail. (T II, 90, 109.) This would occur one or two days a week. (T II, 91.)

This abuse also occurred in [Petitioner's] bedroom. (T II, 92.) [C.B.] and Evan would play "hide-and-go-seek" in [Petitioner's] room and, while [C.B.] would be counting (and Evan hiding), [Petitioner] would count with [C.B.] and, while Evan would hide, [Petitioner] would pull down [C.B.'s] pants and underwear and touch the inside of her vagina with his fingers. (T II, 92-94.) Some identical abuse by [Petitioner] also occurred in Bay Court Park on Andersonville Road. (T II, 96-98, 145-147.)

The abuse continued when [C.B.] was seven years old and "[s]ome of eight" (T II, 95, 98.) She recalled that at the age of seven, while in the garage, [Petitioner's] penis touched her butt, and that this sometimes occurred at the same time that [Petitioner] would touch her vagina with his fingers. (T II, 103-104, 132.) [Petitioner] would also take her hand and place it on his penis. (T II, 106.)

[C.B.] continued going over to [Petitioner's] home to play with Evan even though she did not like what was happening with [Petitioner] and did not want it to continue. (T II, 139, 140.)

Once [C.B.] turned eight years old, the abuse started occurring less often. (T II, 99.) Between the age of eight and nine, the touching stopped altogether. (T II, 108.) [C.B.] remembered that this was about the time that she got a new bike. (T II, 108, 163.)

When [C.B.] was about 13 years old, [Petitioner] began "shining lights" into her room. (T II, 110.) In other words, [Petitioner] "would take a [red] laser and shine it through my windows." (T II, 110.) [Petitioner] had told her that the light shining through her window would be a signal to her to lift up her shirt (something that [C.B.] did at least once). (T II, 124-125, 151-152.)

Mostly, [C.B.] would look out her window and see [Petitioner] standing there with no pants, his penis exposed and his hand moving about his penis. (T II, 111, 152.) This would occur "a couple times a week." (T II, 111.) [C.B.] knew that it was [Petitioner] because he would shine a flashlight on his face and also on his "area." (T II, 112.) However, there were some occasions when [Petitioner] would be standing there and his pants would not be down. (T II, 115, 152.) This continued until [C.B.] was 17 years old. (T II, 112.) There were others that saw this occur – Danielle, Micki, Cassie, and Nicky (friends of [C.B.'s]). (T II, 112-113.)

[C.B.] never told anyone else (other than her friends that were present when it occurred) about [Petitioner's] "laser" incidents. (T II, 113.) She did not tell anyone else because she was scared. (T II, 113.) She also did not want Evan to lose his dad because [Petitioner] had previously told her that he would go to jail if she told anyone. (T II, 114.)

When she was 14 and 15 years old, [Petitioner] began asking [C.B.] to give him

3

"blowjobs." (T II, 116, 158, 182.) In addition, [Petitioner] would tell [C.B.] that she would like it if he "licked inside" her. (T II, 116.) [Petitioner] told her at the beginning of April of 2007 that he would find a way for her to "sneak out". (T II, 119, 168-169.) He also talked about "blow jobs" in this conversation. (T II, 169.)

In April of 2007, [C.B.] told Michelle Hobbs "about the whole thing" while she was staying overnight at her house. (T II, 118, 121.) She told her because she was beginning to become fearful that that "something would actually really happen ... [L]ike sex or ... him coming over." (T II, 119.) At that point, [C.B.] did not realize that the police were going to get involved. (T II, 121.) She had told her friends that saw [Petitioner] shining the laser and exposing himself not to tell because she thought they would get in trouble for looking. (T II, 122, 156.)

63-year-old James Brashear lived at 2633 Mott Avenue in Waterford Township. (T, 311-312.) [Petitioner] was one of Brashear's neighbors. (T, 313.) [Petitioner's] home could be seen from the back rooms of the Brashear home. (T, 316.) Brashear had met [Petitioner's] wife and children in the 17 years that they ([Petitioner] and his family) lived in the neighborhood. (T, 317.) There were never ever any problems between [Petitioner's] children and Brashear's children. (T, 318.) He recalled [C.B.] getting a new bike when she was seven or eight years old. (T, 327.)

When [C.B.] was between the age of five and ten, she would go over to [Petitioner's] home. (T, 319.) At that time, Brashear was working the "third shift" at General Motors meaning that he was working from 10:30 in the evening to 7:00 in the morning. (T, 319.) At that time, Brashear's wife worked days at Kohl's (7:00 a.m. to 5:00 p.m.) and he looked after [C.B.]. (T, 320.) [C.B.'s] bedroom had a door and, when she would go into there, Brashear had no idea what went on in there. (T, 347-348.)

On April or May of 2007, Brashear learned some disturbing information from his daughter [C.B.], involving her and [Petitioner]. (T, 323.) A personal friend of the family, Connie Landry gave Brashear some information about [C.B.] and [Petitioner] in a conversation that lasted about 45 minutes. (T, 324.) He later spoke with [C.B.], who was upset, "her face was red and her eyes were swelled up". (T, 326.) Brashear then called Detective Palombo. (T, 325.)

17-year-old Micki Miller attended Waterford Mott High School. (T II, 5.) She had been friends with [C.B.] since kindergarten. (T II, 6.) When she used to go to [C.B.'s] house, she used to see Evan LaRose, [Petitioner's] son. (T II, 6-7.) When visiting [C.B.'s] home, she used to go inside her bedroom. (T II, 8.) While they were in the seventh or eighth grade, Micki saw something in [C.B.'s] room that bothered her. (T II, 8.) Sometimes, while spending the night with [C.B.] in her bedroom, she would see a laser shine through the bedroom window onto her closet door. (T II, 8, 17-18.)

4

One time Micki and [C.B.] looked out the bedroom window and saw [Petitioner] shining the laser through a back window of his house. (T II, 10, 25-26, 28.) Micki and [C.B.] then hid under the covers of the bed because they were afraid. (T II, 11, 19.) Micki never told anyone about what she saw. (T II, 11, 20.) In May of 2007, Micki spoke with Sergeant Palombo at the police station at the request of the police. (T II, 11, 15, 22.)

17-year-old Danielle Schomer was a senior at Clarkston Renaissance School. (T II, 30.) She went to elementary and middle school with [C.B.] and they were friends during that time. (T II, 31.) Danielle had spent the night with [C.B.] at her house and slept with her in her bedroom. (T II, 31-32,) However, while she was in the seventh or eighth grade something began happening when she would spend the night at [C.B.'s] house that bothered her - a red laser light coming through [C.B.'s] bedroom window at night from [Petitioner's] home. (T II, 34-35.) On occasion Danielle would look out the window and see [Petitioner]. (T II, 37.) On at least two occasions, Danielle looked out the window and saw [Petitioner] wearing a shirt, but no pants, and holding a flashlight down onto his private area and [Petitioner] would "play" and "touch" his penis. (T II, 38-40.) Some years later, at dance class, [C.B.] told Danielle that the police were going to call her. (T II, 55.) The police did in fact call Danielle and took her to a place called CARE House to interview her. (T II, 55-56.)

14-year-old Cassie Landry was Michelle Hobbs' daughter. (T II, 198-199.) She considered [C.B.] her best friend. (T II, 199.) When she was in the seventh grade and 12 years old, she remembered something happening while staying over [C.B.'s] house that bothered her. (T II, 202-203.) She was in [C.B.'s] computer room (which was next to her bedroom at the back of the house) at night with [C.B.] when she saw a red laser come in through the window. (T II, 204-205.) Cassie looked out the window and saw [Petitioner], with his pants and underwear down to his ankles, and he was holding his penis. (T II, 205-206, 210.) She was scared to say anything because she thought that she would get in trouble. (T II, 207, 211.) After seeing this, she and [C.B.] went back to what they were doing on the computer. (T II, 208.)

Terri LaRose was [Petitioner's] wife. (ET I, 4.) She and [Petitioner] had two children – Evan born in 1991 and Marie born in 1986. (ET I, 5.) When Evan was three/four/five/six years-old, she recalled that [C.B.] would come over to play at her house and there were times that Evan went to her ([C.B.'s]) house to play. (ET I, 6-7.) Terri worked during this time period during the daytime. (ET I, 7-8.) There were periods of time when [Petitioner] was not working at all, possibly when Evan was four or five years old. (ET I, 9-10.)

Terri testified that Evan started using the back room as his bedroom near the end of March, 2007. (ET I, 13.) Prior to that, the back bedroom was used by her and [Petitioner]. (ET I, 16.) Terri denied that she had accessed child pornography or seen

5

either of her children access child pornography on the computer. (ET I, 26-27.) Terri testified that she had seen [Petitioner] access the computer after it had been moved from the bedroom to the living room, especially after he got home after work and on the weekends. (ET I, 29.) She admitted that she would often be in bed while he was using the computer. (ET I, 30.) Terri also admitted to seeing a laser pointer in the home before 2007. (ET I, 31.)

Terri admitted that she had talked a lot about the case with her children, including what they said to Sergeant Palombo. (ET I, 34.) She denied discussing their proposed testimony in court. (ET I, 35.) She admitted that her daughter Marie had told her about what some of the witnesses were saying on the stand. (ET I, 36.)

On cross-examination, Terri testified that the computer with the panda (a "third one") belonged to her daughter and that her daughter had brought it back with her from Iowa when she moved back home in the second week of April, 2007. (ET I, 44.) Terri testified that her daughter had lived in Iowa with her then fiancé Charles. (ET I, 46.) She claimed that she never saw [Petitioner] use the computer with the panda on it, although it was placed in the living room and anyone in the family had access to it. (ET I, 59, 60-61.) Terri claimed that they started using the computer with the panda after their computer got a virus and got placed in the laundry room (ET I, 57.)

In response to a jury question "Who have you seen use the computer with the panda bear?" Terri responded, "I have seen my daughter use it, seen -- we've all accessed it one time or another." (ET I, 72-73.) The trial court followed up with, "Have you seen everyone in the house access, is that what your answer is?" (ET I, 73.) Terri responded, "[y]es." (ET I, 73.)

16-year-old Evan LaRose knew [C.B.] since his earliest childhood. (ET II, 7.) He and [C.B.] started playing together as early as when he was three (and [C.B] was four – she being one year older than him). (ET II, 9.) They were friends up to when [C.B.] was 17 years old and it was then that they stopped talking. (ET II, 9.) When Evan was around eight years-old, he and [C.B.] would play such games as "hide-and-go-seek" and sometimes just [Petitioner] would be home when he and [C.B.] were playing this game. (ET II, 10, 15, 17.) He also recalled going to a park with [Petitioner] and [C.B.] (although he called it "Bay Court Park"). (ET II, 11-12.)

When the police executed a search warrant in his parents' home, among the items they took was [sic] several flashlights and a computer from the living room (which Evan admitted he had heard his mother say had been recently moved from the bedroom - where it had always been - into the living room). (ET II, 23-24, 29.) Evan described the computer as blue and having a panda on the side of the tower. (ET II, 24.) The police also took a computer from the garage. (ET 11, 25.) Evan denied that he ever accessed child pornography on the "blue" computer. (ET II, 27.) Sergeant

6

Palombo showed Evan some pictures from the computer and Evan did not recognize any of them. (ET II, 34.) During his testimony, Evan admitted that he, his sister, and his mother had gone over police reports the night before his testimony and that they talked about what they would testify about and that they would try to make sure they would have the same story. (ET II, 39.)

On cross-examination, Evan denied that this meant that they were getting together so that they were going to lie in court. (ET II, 40.) Also on cross-examination, Evan mentioned that there was a non-working computer in the home - an HP desktop in the laundry room that had a virus (it had originally been in the bedroom). (ET II, 4, 451.) On cross-examination, Evan stated that his sister Marie was living with a guy in Iowa and had the blue computer with the panda with her at that time. (ET II, 42-43, 62.) She brought it to the family home at Christmas of 2006. (ET II, 59, 63.) Evan admitted to looking at pornography on the blue computer, but not child pornography. (ET I, 43-45.)

Evan testified that there came a time (about two or three years prior to trial - 2005/2006) that [Petitioner] purchased him a laser light. (ET II, 49.) Evan testified, about once or twice a week "from 13 to 15" he shined the light at [C.B.'s] window and she would come to the window. (ET II, 50, 51.) He denied that he ever masturbated himself when he did so or that he pulled his pants and underwear down when he did so. (ET II, 50, 52) He also claimed that [C.B.] would also use a laser to get his attention. (ET II, 51.) He claimed that he did this from his parents' room, which subsequently became his room. (ET II, 52.) Evan denied ever using a flashlight during these incidents. (ET II, 54.)

Jennifer Hay, a forensic interviewer, interviewed [C.B.], Danielle Schomer, and Cassie Landry, at CARE House in April and June of 2007. (T II, 222-224, 230.)

Detective Sergeant Giovanni Palombo of the Waterford Police Department had been with the department for 18 years. (T II, 255.) Detective Palombo testified that, when [Petitioner's] wife (Terri) gave consent to a search of the family home, he allowed her and the children to assist him in finding the items that they were looking for, including the computers. (T II, 274.) They did not point out that there was a computer in the laundry room, nor did Detective Palombo and his team find a computer in the laundry room (although, in deference to the family, they did not tear things apart or take apart shelves to see what was behind them). (T II, 269-274.)

It was later determined that there was evidence (images) found on the computer with the panda on the side. (T II, 276; T III, 20.) Terri LaRose ([Petitioner's] wife) later told Detective Palambo that they had had the computer with the panda built and that they had had it for a very long time (T II, 284.) Terri LaRose mentioned that she had moved the computer with the panda on the side from her bedroom "where it always

was" because she did not want her children to get access to the computer without her control. (T III, 18.) Neither Terri nor Evan LaRose mentioned a third (HP) computer. (T III, 16.)

Lieutenant Frank Mostek of the Waterford Police Department forensically examined the two computers that were seized from [Petitioner's] home. (T III, 49, 53-54.) He found images of child sexually abusive material on the computer with the panda on the tower. (T III, 54, 56.) He also found videos that appeared to have child sexually abusive material on them that appeared to have been acquired through "Limewire," a peer-to-peer file sharing program similar to Napster. (T III, 55.) On cross-examination, Lieutenant Mostek testified that he was unable to determine where the computer was when those images/videos were downloaded or specifically what date those images were downloaded. (T III, 69-70, 73.)

Amy Allen was qualified as an expert in the areas of forensic interviewing and characteristics of children who report sexual abuse. (T III, 88, 94.) She discussed in detail these areas of her expertise during her testimony noting in particular that, in her experience, that it was not unusual for a child who reports being sexually abused to delay the disclosure for period of months or years. (T III, 106.)

Pros. App. Brf., pp. 1-10.

Following his convictions and sentencing, Petitioner filed an appeal of right with the Michigan Court of Appeals raising the same claims presented on habeas review. The court denied relief on those claims and affirmed Petitioner's convictions. *People v. LaRose*, No. 282219, 2009 WL 1027463 (Mich. Ct. App. April 16, 2009) (unpublished). Petitioner then filed an application for leave to appeal with the Michigan Supreme Court, which was denied in a standard order. *People v. LaRose*, Mich. 485 Mich. 867, 771 N.W.2d 729 (2009).

Petitioner thereafter instituted this federal habeas action raising the following claims:

I.      The trial judge abused the discretion conferred him by MCL 768.27a, MRE 404(B) and 403 and denied Petitioner due process by allowing the prosecution to present, in a child CSC prosecution, evidence that his family computer contained child pornography which was downloaded years after the alleged offenses occurred and absent evidence that it was downloaded by Petitioner or that he knew it existed.

8

II.     The trial court violated Petitioner's due process right to trial by an impartial jury by allowing jurors to submit questions for witnesses during the trial.

III.    Petitioner was deprived of his constitutional right to due process by two instances of the prosecutor failing to turn over critical discovery and the trial court's failure to grant a meaningful remedy as a result of these instances of misconduct.

IV.     Petitioner's 35-year minimum and 55-year maximum sentences are disproportionate to the offense and the offender and abuses of the court's sentencing discretion for a 51-year-old first time felony offender.

V.      Petitioner is entitled to re-sentencing before a different judge because the trial judge based his sentence in part on Petitioner's refusal to admit guilt and the court's opinion that he has little chance of rehabilitation.

Respondent has filed an answer to the petition contending that it should be denied because the claims are not cognizable and/or lack merit.

## III.   <u>Standard of Review</u>

The provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), codified 28 U.S.C. § 2241 *et seq.*, govern this case because Petitioner filed his petition after the AEDPA's effective date. *See Lindh v. Murphy*, 521 U.S. 320, 336 (1997). The AEDPA provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
>
> (1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. §2254(d) (1996).

"A state court's decision is 'contrary to' ... clearly established law if it 'applies a rule that

9

contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [that] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) (per curiam) (quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000)); *see also Bell v. Cone*, 535 U.S. 685, 694 (2002). "[T]he 'unreasonable application' prong of § 2254(d)(1) permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (quoting *Williams*, 529 U.S. at 413); *see also Bell*, 535 U.S. at 694. However, "[i]n order for a federal court find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous. The state court's application must have been 'objectively unreasonable.'" *Wiggins*, 539 U.S. at 520-21 (citations omitted); *see also Williams*, 529 U.S. at 409. The "AEDPA thus imposes a 'highly deferential standard for evaluating state-court rulings,' and 'demands that state-court decisions be given the benefit of the doubt.'" *Renico v. Lett*, _ U.S. _, 130 S. Ct. 1855, 1862 (2010) (quoting *Lindh*, 521 U.S. at 333, n. 7; *Woodford v. Viscotti*, 537 U.S. 19, 24 (2002) (per curiam)).

The Supreme Court recently held that "a state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, _ U.S. _, 131 S. Ct. 770, 786 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The Supreme Court emphasized "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* ( citing *Lockyer v. Andrade,* 538 U.S. 63, 75 (2003). Pursuant to § 2254(d), "a habeas court must determine what arguments or theories supported or ... could have supported, the state court's

10

decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision" of the Supreme Court. *Id.* Thus, in order to obtain habeas relief in federal court, a state prisoner must show that the state court's rejection of his claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.*

Section 2254(d)(1) limits a federal habeas court's review to a determination of whether the state court's decision comports with clearly established federal law as determined by the Supreme Court at the time the state court renders its decision. *See Williams*, 529 U.S. at 412; *see also Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009) (noting that the Supreme Court "has held on numerous occasions that it is not 'an unreasonable application of clearly established Federal law' for a state court to decline to apply a specific legal rule that has not been squarely established by this Court") (quoting *Wright v. Van Patten*, 552 U.S. 120, 125-26 (2008) (per curiam)); *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003). Section 2254(d) "does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'" *Harrington*, 131 S. Ct. at 785. Furthermore, it "does not require citation of [Supreme Court] cases–indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8 (2002); *see also Mitchell*, 540 U.S. at 16. While the requirements of "clearly established law" are to be determined solely by Supreme Court precedent, the decisions of lower federal courts may be useful in assessing the reasonableness of the state court's resolution of an issue. *See Stewart v. Erwin*, 503 F.3d 488, 493 (6th Cir. 2007) (citing *Williams v. Bowersox*, 340 F.3d 667, 671 (8th Cir. 2003)); *Dickens v. Jones*, 203 F. Supp. 354, 359 (E.D. Mich. 2002).

A state court's factual determinations are presumed correct on federal habeas review. *See* 28 U.S.C. § 2254(e)(1). A habeas petitioner may rebut this presumption only with clear and convincing evidence. *See Warren v. Smith*, 161 F.3d 358, 360-61 (6th Cir. 1998). Moreover, habeas review is "limited to the record that was before the state court." *Cullen v. Pinholster*, _ U.S. _, 131 S. Ct. 1388, 1398 (2011).

## IV.   <u>Analysis</u>

### A.   <u>Other Acts Evidence Claim</u>

Petitioner first asserts that he is entitled to habeas relief because the trial court erred in admitting other acts evidence, namely child pornography downloaded on his home computer. Respondent contends that this claim is not cognizable and lacks merit.

The Michigan Court of Appeals denied relief on this claim, finding that the child pornography evidence was properly admitted under state law, MICH. COMP. LAW § 768.27a(1), MICH. R. EVID. 404(b). *LaRose*, 2009 WL 1027463 at *2-3. The state court's decision is neither contrary to Supreme Court precedent nor an unreasonable application thereof. Alleged trial court errors in the application of state evidentiary law are generally not cognizable as grounds for federal habeas relief. *See Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991) ("it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions"); *Serra v. Michigan Dep't of Corrections*, 4 F.3d 1348, 1354 (6th Cir. 1993). "Trial court errors in state procedure and/or evidentiary law do not rise to the level of federal constitutional claims warranting relief in a habeas action, unless the error renders the proceeding so fundamentally unfair as to deprive the petitioner of due process under the Fourteenth Amendment." *McAdoo v. Elo*, 365 F.3d 487, 494 (6th Cir. 2004) (quoting *McGuire*, 502 U.S. at 69–70); *see Wynne v. Renico*, 606 F.3d 867,

871 (6th Cir. 2010) (citing *Bey v. Bagley*, 500 F.3d 514, 519-20 (6th Cir. 2007)); *Bugh v. Mitchell*,

329 F.3d 496, 512 (6th Cir. 2003).

Accordingly, to the extent that Petitioner asserts that the trial court erred in admitting

testimony under the Michigan Rules of Evidence, he merely alleges violations of state law which

do not entitle him to federal habeas relief. *See, e.g., Bey v. Bagley*, 500 F.3d 514, 519 (6th Cir.

2007); *Wheeler v. Jones*, 59 F. App'x 23, 28 (6th Cir. 2003). State courts are the final arbiters of

state law and the federal courts will not intervene in such matters. *See Lewis v. Jeffers*, 497 U.S.

764, 780 (1990); *see also Bradshaw v. Richey*, 546 U.S. 74, 76 (2005); *Sanford v. Yukins*, 288 F.3d

855, 860 (6th Cir. 2002).

Additionally, as to the admission of other acts, the United States Supreme Court has

declined to hold that similar "other acts" evidence is so extremely unfair that its admission violates

fundamental conceptions of justice. *See Dowling v. United States*, 493 U.S. 342, 352-53 (1990).[1]

Thus, "[t]here is no clearly established Supreme Court precedent which holds that a state violates

due process by permitting propensity evidence in the form of other bad acts evidence." *Bugh*, 329

F.3d 496, 512 (6th Cir. 2003). Consequently, there is no Supreme Court precedent that the state

court decisions could be deemed "contrary to" under 28 U.S.C. § 2254(d)(1). *Id*. at 513; *see also*

*Adams v. Smith*, 280 F. Supp. 2d 704, 716 (E.D. Mich. 2003). Petitioner has thus failed to state a

claim upon which habeas relief may be granted as to this issue.

Furthermore, even if Petitioner states a cognizable claim, he is not entitled to relief.

---

[1]While the Supreme Court has addressed whether prior acts testimony is permissible under the Federal Rules of Evidence, *see Old Chief v. United States*, 519 U.S. 172 (1997); *Huddleston v. United States*, 485 U.S. 681 (1988), it has not explicitly addressed the issue in constitutional terms.

Petitioner has not shown that the admission of the other acts evidence rendered his trial fundamentally unfair. The child pornography evidence was relevant and admissible under state evidentiary law on the issues of motive, state of mind, and intent. Questions about the connection between Petitioner and the images taken from his home computer went to the weight of the evidence and were matters for the jury to decide. Moreover, the trial court instructed the jury on the proper consideration of such evidence. Jurors are presumed to follow a trial court's instructions. *See Penry v. Johnson*, 532 U.S. 782, 799 (2001) (citing *Richardson v. Marsh*, 481 U.S. 200, 211 (1987)); *United States v. Powell*, 469 U.S. 57, 66 (1984) ("Jurors ... take an oath to follow the law as charged, and they are expected to follow it."). Petitioner has failed to establish that the admission of the other acts evidence was erroneous or, more importantly, that it rendered his trial fundamentally unfair. Habeas relief is not warranted on this claim.

### B.  Use of Jury Questions Claim

Petitioner next asserts that he is entitled to habeas relief because the trial court violated his due process right to trial by an impartial jury by allowing jurors to submit questions for witnesses during trial. Respondent contends that this claim is not cognizable and lacks merit.

The Michigan Court of Appeals denied relief on this claim, finding that the use of jury questions was permissible under state law, that the trial court followed correct procedures, and that no due process violation occurred. *LaRose*, 2009 WL 1027463 at *1. The state court's decision is neither contrary to Supreme Court precedent nor an unreasonable application thereof. "The Sixth and Fourteenth Amendments guarantee a criminal defendant an impartial jury in state court." *Mahdi v. Bagley*, 522 F.3d 631, 636 (6th Cir. 2008) (citing *Ristaino v. Ross*, 424 U.S. 589, 595 n. 6 (1976); *Irvin v. Dowd*, 366 U.S. 717, 722 (1961)). Jurors, however, are presumed to be impartial,

14

*United States v. Guzman*, 450 F.3d 627, 629 (6th Cir. 2006) (citing *Irvin*, 366 U.S. at 723), and "due process does not require a new trial every time a juror has been placed in a potentially compromising situation .... Due process means a jury capable and willing to decide the case solely on the evidence before it...." *Smith v. Phillips*, 455 U.S. 209, 217 (1982). The petitioner bears the burden of proving that the jury was biased. *See United States v. Wheaton*, 517 F.3d 350. 362 (6th Cir. 2008).

The United States Supreme Court has not specifically ruled on the propriety of jurors submitting questions for witnesses. The United States Court of Appeals for the Sixth Circuit, while not favoring the practice, has held that "allowing jurors to ask questions during criminal trials is permissible and best left to the discretion of the trial judge." *United States v. Collins*, 226 F.3d 457, 461 (6th Cir. 2000). The Sixth Circuit has indicated that certain precautions should be taken such as notifying the jurors and parties about the practice, requiring the jurors to submit their questions in writing, and instructing the jurors that some questions may not be asked or could be rephrased as required by evidentiary rules. *Id.* at 464. The Michigan courts have sanctioned a similar practice. *See People v. Heard*, 388 Mich. 182, 187, 200 N.W.2d 73 (1972). The trial court appears to have followed state procedure and taken appropriate cautionary steps. Petitioner has not shown that he was prejudiced by the jury's questions, that the jury was biased against him, or that his due process rights were otherwise violated. This claim lacks merit. *See, e.g., Melling v. Prelesnik*, No. 10-CV-13488, 2010 WL 3862713, *2-3 (E.D. Mich. Sept. 28, 2010) (denying habeas relief on same claim); *Baugh v. Quigley*, No. 05-CV-71676, 2007 WL 2413089, *4-6 (E.D. Mich. Aug. 21, 2007) (finding same claim procedurally defaulted and meritless); *accord Banks v. Davis*, No. 06-CV-280, 2009 WL 1874093, *4-5 (W.D. Mich. June 26, 2009). Habeas relief is not warranted.

15

## C.    Discovery/Non-Disclosure of Evidence Claim

Petitioner next asserts that he is entitled to habeas relief because the prosecutor failed to turn over critical discovery and the trial court failed to provide a meaningful remedy for the discovery violation.    Specifically, Petitioner claims that the prosecutor failed to disclose the victim's therapist's notes and videotapes of police interviews with Petitioner, his wife, and his son. Respondent contends that this claim lacks merit.

The Michigan Court of Appeals denied relief on this claim, finding that the therapist's notes were subject to an unqualified privilege and were not discoverable and that, while the videotapes should have been disclosed, their non-disclosure did not result in a due process violation and the trial court fashioned an appropriate remedy by not allowing the prosecution to use the evidence in its case-in-chief. *LaRose*, 2009 WL 1027463 at *3-4. The state court's decision is neither contrary to Supreme Court precedent nor an unreasonable application thereof.

First, to the extent that Petitioner alleges a violation of the trial court's discovery order or state discovery rules, he is not entitled to federal habeas relief.  A federal court may only grant habeas relief to a person who is "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).  Trial court errors in the application of state procedure or evidentiary law are not cognizable as grounds for federal habeas relief. *See, e.g., Estelle*, 502 U.S. at 67-68.  Thus, any claim by Petitioner that the prosecution violated the trial court's discovery order does not provide a basis for federal habeas relief and must be denied. *See Lorraine v. Coyle*, 291 F.3d 416, 441 (6th Cir. 2002).

Moreover, Petitioner has failed to establish a violation of his federal constitutional rights. It is well-settled that there is no general constitutional right to discovery in a criminal case. *See*

16

*Weatherford v. Bursey*, 429 U.S. 545, 559 (1977); *United States v. Presser*, 844 F.2d 1275, 1281 (6th Cir. 1988). The United States Supreme Court has held that the prosecutor's failure to disclose evidence favorable to the defense constitutes a denial of due process "where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87 (1963). In other words, to find a *Brady* violation, not only must the evidence be suppressed, but the suppressed evidence must be material and favorable to the accused. *Elmore v. Foltz*, 768 F.2d 773, 777 (6th Cir. 1985).

Favorable evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985); *see also Kyles v. Whitley*, 514 U.S. 419, 432-36 (1995). Material evidence is that which is "so clearly supportive of a claim of innocence that it gives the prosecution notice of a duty to produce." *United States v. Clark*, 988 F.2d 1459, 1467 (6th Cir. 1993). The duty to disclose favorable evidence includes the duty to disclose impeachment evidence. *Bagley, supra; Giglio v. United States*, 405 U.S. 150, 154-55 (1972).

The *Brady* rule only applies to "the discovery, after trial, of information which had been known to the prosecution but unknown to the defense." *United States v. Agurs*, 427 U.S. 97, 103 (1976); *see also Mullins v. United States*, 22 F.3d 1365, 1370-71 (6th Cir. 1994). Moreover, a *Brady* violation does not occur if previously undisclosed evidence is disclosed during trial unless the defendant is prejudiced by its prior non-disclosure. *See United States v. Word*, 806 F.2d 658, 665 (6th Cir. 1986). Thus, in order to establish a *Brady* violation, a petitioner must show that: (1) evidence was suppressed by the prosecution in that it was not known to the petitioner and not available from another source; (2) the evidence was favorable or exculpatory; and (3) the evidence

17

was material to the question of the petitioner's guilt. *See Carter v. Bell*, 218 F.3d 581, 601 (6th Cir. 2000); *see also Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). The petitioner bears the burden of establishing a *Brady* violation. *Carter*, 218 F.3d at 601.

Petitioner has not met his burden. As to the therapist's notes, such notes are privileged under state law and not subject to discovery or disclosure. *See* MICH. COMP. LAWS § 333.18237; MICH. CT. R. 6.201(C)(1). There is no indication that the prosecution had access to any such notes. Moreover, the trial court instructed the jury to disregard the prosecution's inquiry into such matters when the CARE House interviewer testified at trial. Petitioner has failed to demonstrate that the non-disclosure of any therapist's notes was improper or violated his constitutional rights.

As to the videotaped interviews, the record indicates that the videotapes were not suppressed given that they were disclosed to the defense at the time of trial and Petitioner has not shown that any delay in disclosure prejudiced his defense. Additionally, the record indicates that the videotaped interviews of Petitioner's wife and son were inculpatory (or at least not exculpatory) and were not beneficial to the defense. While Petitioner's videotaped interview may have been exculpatory in nature, Petitioner was aware of his own statement to police and has not shown that the underlying information was in the sole possession of the prosecution. More importantly, Petitioner has not shown that there is a reasonable probability that, had the foregoing evidence been previously disclosed to the defense, the result of the proceeding would have been different. To be sure, defense counsel had the opportunity to review the videotapes mid-trial and chose not to use them for practical and strategic reasons. Given such circumstances, the Court cannot conclude that Petitioner's constitutional rights were violated or that he was deprived of a fundamentally fair trial. Habeas relief is not warranted on this claim.

18

**D.      Sentencing Claims**

Lastly, Petitioner asserts that he is entitled to habeas relief due to sentencing errors. Specifically, he asserts that his sentence is disproportionate and that the trial court erred in basing its sentence on the refusal to admit guilt and the unlikelihood of rehabilitation.   Respondent contends that these claims are not cognizable and lack merit.

As an initial matter, the Court notes that Petitioner's sentences are within the statutory maximums. *See* MICH. COMP. LAWS §§ 750.520b(1)(a), 750.520c(1)(a), 750.145a, 750.335a(2)(b). A sentence within the statutory limit is generally not subject to federal habeas review.   *See Townsend v. Burke*, 334 U.S. 736, 741 (1948); *Cook v. Stegall*, 56 F. Supp. 2d 788, 797 (E.D. Mich. 1999).   Claims which arise out of a state court's sentencing decision are not normally cognizable upon habeas review unless the petitioner can show that the sentence imposed exceeded the statutory limits or is wholly unauthorized by law.   *See Lucey v. Lavigne*, 185 F. Supp. 2d 741, 745 (E.D. Mich. 2001).   Petitioner has made no such showing.   His sentences are within the statutory maximums set by state law.

**1.      Proportionality**

Petitioner asserts that his concurrent sentences of 35 to 55 years imprisonment for his first-degree criminal sexual conduct convictions are disproportionate.   The Michigan Court of Appeals denied relief on this claim, finding that the sentences are proportionate to the offense and the offender even though they constitute an upward departure from the recommended minimum guideline range. *LaRose*, 2009 WL 1027463 at *5-6.

The state court's decision is neither contrary to Supreme Court precedent nor an unreasonable application thereof.   To the extent that Petitioner asserts that his sentence is

19

disproportionate under state law, he fails to state a claim for federal habeas relief. *See Austin v. Jackson*, 213 F.3d 298, 300 (6th Cir. 2000). Similarly, any challenge to the trial court's upward departure from the sentencing guidelines is not cognizable on federal habeas review because it is a state law claim. *See, e.g., Howard v. White*, 76 F. App'x 52, 53 (6th Cir. 2003) ("A state court's alleged misinterpretation of state sentencing guidelines and crediting statutes is a matter of state concern only."); *Cheatham v. Hosey*, 12 F.3d 211, 1993 WL 478854, *2 (6th Cir. Nov.19, 1993) (departure from state sentencing guidelines is a state law issue not cognizable on federal habeas review); *Mitchell v. Vasbinder*, 644 F. Supp. 2d 846, 867 (E.D. Mich. 2009). Moreover, there is no federal constitutional right to individualized sentencing. *See United States v. Thomas*, 49 F.3d 253, 261 (6th Cir. 1995).

Petitioner is also not entitled to relief on any claim that his sentences constitute cruel and unusual punishment under the Eighth Amendment. The United States Constitution does not require strict proportionality between a crime and its punishment. *See Harmelin v. Michigan*, 501 U.S. 957, 965 (1991). A sentence that falls within the maximum penalty authorized by statute "generally does not constitute 'cruel and unusual punishment.'" *Austin*, 213 F.3d at 302 (internal citation omitted). Petitioner's sentences are within the statutory maximums for his offenses. The state trial court thus acted within its discretion in imposing Petitioner's sentences and there is no extreme disparity between his crimes and sentences so as to offend the Eighth Amendment. Habeas relief is not warranted on this claim.

### 2. Factors

Lastly, Petitioner asserts that the trial court erred at sentencing by relying upon his refusal to admit guilt and the unlikelihood of rehabilitation. The Michigan Court of Appeals denied relief

on this claim, finding that the trial court did not impermissibly base its sentence on Petitioner's refusal to admit guilt and that the trial court properly considered Petitioner's capacity for rehabilitation in imposing sentence. *LaRose*, 2009 WL 1027463 at *5-6.

The state court's decision is neither contrary to Supreme Court precedent nor an unreasonable application of federal law or the facts. In *Mitchell v. United States*, 526 U.S. 314, 328-29 (1999), the United States Supreme Court held that the Fifth Amendment right against self-incrimination prevents a sentencing court from drawing negative inferences from a defendant's silence in determining the facts relating to the circumstances and details of the crime. The Supreme Court expressly declined to consider the questions of whether a defendant's silence bore upon a court's determination of lack of remorse or upon a defendant's acceptance of responsibility for the purpose of a downward departure under the federal sentencing guidelines, because those issues were not before the Court. *Id.* The Sixth Circuit has affirmed a grant of the writ to a petitioner whose sentencing judge clearly took his failure to admit guilt into consideration in imposing his sentence. *See Ketchings v. Jackson*, 365 F.3d 509, 512-14 (6th Cir. 2004).

In this case, the trial court's comments, taken in context, suggest that the court was commenting on the severity and ongoing nature of the crimes and Petitioner's lack of remorse and low capacity for rehabilitation, rather than penalizing him for any refusal to admit guilt at the time of trial or sentencing. *See Paluskas v. Bock*, 410 F. Supp. 2d 602, 615 (E.D. Mich. 2006) (denying habeas relief on similar claim). Lack of remorse and potential for rehabilitation are appropriate sentencing considerations under Michigan law, *see People v. Houston*, 448 Mich. 312, 323, 532 N.W.2d 508 (1995), and are not precluded by federal law. *See In re Cook*, 551 F.3d 542, 551 (6th Cir. 2009) ("It is well established that a defendant's remorse-or lack thereof-is an appropriate

consideration in meting out punishment."); *United States v. Castillo-Garcia*, 205 F.3d 887, 889 (6th Cir. 2000) (lack of true remorse is valid consideration under federal sentencing guideline providing for downward adjustment based upon acceptance of responsibility). The record as a whole indicates that the state trial court imposed a sentence based upon the circumstances of the crime and other permissible considerations. The Michigan Court of Appeals' decision is neither contrary to United States Supreme Court precedent nor an unreasonable application of federal law or the facts. Habeas relief is not warranted.

## V.   **Conclusion**

For the reasons stated, the Court concludes that Petitioner is not entitled to federal habeas relief on the claims contained in his petition and his petition must therefore be denied.

Before Petitioner may appeal the Court's decision, a certificate of appealability must issue. *See* 28 U.S.C. § 2253(c)(1)(a); Fed. R. App. P. 22(b). A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). When a court relief on the merits, the substantial showing threshold is met if the petitioner demonstrates that reasonable jurists would find the court's assessment of the claim debatable or wrong. *See Slack v. McDaniel*, 529 U.S. 473, 484-85 (2000). "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). In applying this standard, a court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merits. *Id.* at 336-37. Having conducted the requisite review, the Court concludes that Petitioner has failed to make a substantial showing of the denial of a constitutional right as to his habeas claims. A certificate of appealability is not warranted. The

Court further concludes that Petitioner should not be granted leave to proceed *in forma pauperis* on appeal as any appeal cannot be taken in good faith. *See* Fed. R. App. P. 24(a).

Accordingly;

**IT IS ORDERED** that the petition for a writ of habeas corpus is **DENIED** and **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER ORDERED** that a certificate of appealability and leave to proceed *in forma pauperis* on appeal are **DENIED**.

PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

DATED: 2 - 21- 2012